IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria)

IN RE:                                      )
                                            )
        JOHN KENNETH HAUTMAN                 )
                                            )    Case No. 10-01285
        fka KENNETH JOHN HAUTMAN            )
                                            )    Chapter 7
        Debtor                              )


MARY LYONS

        Plaintiff

v.                                               Adv. Proc. _____

JOHN KENNETH HAUTMAN
fka Kenneth John Hautman
               Defendant

---

## COMPLAINT

---

Comes now petitioner Mary Lyons, a creditor of debtor John Kenneth Hautman,

to object to the dischargeability of certain debts, some of which are owed both to her and

to the minor child, C. H., and some of which are owed to each of them individually.

C.H. is the minor child of petitioner and debtor and petitioner represents his interests in

this case as his custodial parent. (11 U.S.C. sections 523, 727) This Court has jurisdiction

pursuant to 28 USC section 1334 and venue is proper pursuant to 28 USC section 1409.

This is a core proceeding pursuant to 28 USC section 157(b)(2).

1

Petitioner also files this complaint to object to this debtor's discharge under the

bankruptcy code for fraud, concealment, and for violation of this Court's rules and

processes. (11 USC section 727(c )(1), (2)) Petitioner recognizes that only the trustee

may move to examine and undo fraudulent transfers under the bankruptcy code and rules.

(11 USC section 544, 548) However, because the debtor has not provided all the

information required by the bankruptcy court's rules and forms (see paragraphs 12

through end, below), the debtor has hidden relevant facts from the trustee to ensure that

the trustee would be unable to evaluate them. As part of this complaint, petitioner will

provide information on several fraudulent transfers which may well provide sufficient

funds to reimburse all nonsecured creditors of the debtor.

Moreover, the PNC loans fraudulently acquired by debtor and the 529 fund

monies fraudulently taken by debtor, both in violation of court order, combined with

these fraudulent transfers show a pattern of repeated and intentional fraud by debtor.

Debtor has also made numerous attempts to conceal facts from the court and the trustee

by intentionally failing to list all relevant information required by this Court. Just one

example is debtor's failure to list the thousands of dollars which he has taken from his

son's Maryland 529 trust account. (See paragraphs 12-15, below) Another example is

his failure to list several lawsuits in which he is a party in order to conceal the lawsuits'

existence and thus conceal the contents of their files from this Court and the trustee.

There are also numerous errors and omissions by the debtor in his Chapter 7 filing, all

intended to conceal and mislead this Court, the trustee, and his creditors. Based on this

continuous and repeated pattern of concealment and fraud, petitioner asks that this debtor

not be discharged under Chapter 7 (See 11 USC section 727 (a)). Petitioner also

2

respectfully requests this Court to direct the trustee to examine the acts and conduct of

debtor to evaluate grounds for denial of discharge. (11 USC section 727(c )(2))

   In support of this complaint, petitioner would show as follows:

## OBJECTION TO DISCHARGEABILITY OF CERTAIN DEBTS

### Spousal and Child Support

1.    On Schedule E, debtor lists a judgment for $22,500.00 issued against him in favor

of petitioner by the Circuit Court of Montgomery County, Maryland. That money

judgment is for unpaid arrearages of spousal and child support thru December, 2008.

That judgment for arrearages of unpaid spousal and child support was entered by the

Circuit Court for Montgomery County, in Case No.305334-V on April 27, 2009.

(See Ex. 1)

2.    At present, there are also additional amounts of arrearages of spousal and child

support due and owing as stated on Schedule E. Those spousal and child support amounts

were set pursuant to a Court Order entered by the Circuit Court of Montgomery County,

Maryland in Case No. 31574FL.  (See Ex. 2).

3.    Debtor acknowledges all of these debts are for spousal and child support  on

Schedule E. Under 11 U.S.C. section 523(a)(5), amounts owed by the debtor to a former

spouse and child for alimony and child support are not dischargeable. Therefore,

petitioner objects to the dischargeability of these debts on her behalf as well as on behalf

of the minor son, C. H.

### PNC Loans

4.    On Schedule F, debtor lists $ 24,263.89 owed to PNC for Account #xxxxx2913

which was incurred in 2008 and lists petitioner as a co-debtor on the account. Debtor

3

also lists three other unsecured loans with PNC on which petitioner is *not* listed as a co-debtor, also incurred in 2008-- one for all $25,858.78, one for $5062.78 and one for $5591.77. Debtor has misrepresented petitioner as a co-debtor on the first PNC account, Account #xxxx2913.

5.     On information and belief (because both debtor and PNC have refused to give petitioner documentation on the creation or history of PNC Account #xxx2913), the existence of this account at PNC –then Riggs National Bank—apparently predates the divorce of petitioner and debtor in 2004. At the time of the divorce, there was an amount outstanding on a line of credit at Riggs National Bank. Therefore, the parties' divorce settlement, and the court order entering that settlement, stated in Section XI that:

> **[Debtor] shall be solely responsible for, and shall pay in accordance with the terms and conditions thereof, the joint Riggs Bank credit line, and shall indemnify and hold harmless Wife [petitioner] therefrom…The parties covenant and agree that each shall be responsible for his or her own debts and the parties hereto agree that no future debts will be contracted in the name of the other party and to hold the other harmless in the event of a breach of this provision. The parties further agree that [they]…shall neither hereafter secure or attempt to secure any credit upon or in connection with the other, or in his or her name.**

This divorce agreement was signed by the parties on July12, 2004 and the Circuit Court of Montgomery County Maryland entered it as a final order in Case No. 31574FL . (See Ex 3)

6.     Again upon information and belief, that Riggs Bank line of credit—(which debtor apparently alleges is now PNC account #xxx2913)-- was paid off by the debtor in 2005, but not closed out by the debtor. Failing to close out the line of credit and failing to remove petitioner's name from it violated the circuit court's 2004 order. Moreover, by pulling down on that line of credit in 2008, three years after it was paid off in 2005,

debtor intentionally violated the circuit court's order: **"that no future debts will be
contracted in the name of the other party".**  Debtor also knowingly and intentionally
violated the circuit court's order that he **"shall neither hereafter secure or attempt to
secure any credit upon or in connection with the other, or in his or her name."**

7.      In short, as of August, 2004, debtor was prohibited from contracting debts in
petitioner's name and prohibited from securing credit in petitioner's name. This PNC
debt is a "new", post-divorce debt which debtor had no authority to acquire in petitioner's
name.

8.      Based on Schedule F debtor has also opened at least three new unsecured loans
with PNC between the entry of the circuit court's order in 2004 and the present. On the
schedule, those PNC loans are stated to have been incurred solely by debtor in 2008 .
Because precise dates on which these loan accounts were opened are not given on the
schedule, neither petitioner nor the court can know the chronological occurrence, or
history of usage, or information provided in opening the four listed PNC accounts.
However, those other PNC accounts will provide additional evidence of debtor's  intent
to mislead, conceal, and defraud both petitioner and PNC bank. This is particularly true
given debtor's substantial income in 2008, the year the PNC debts were incurred. (See
paragraph 22, below).

9.      Upon information and belief, around January, 2008, debtor withdrew money on
the old Riggs line of credit, which had been paid off in 2005 by debtor, but not closed out
at that time, although debtor managed to remove petitioner's name from numerous
*deposit* accounts at Riggs/PNC in accordance with the court's order. Because debtor
retained petitioner's name on the account, he could rely on assets which petitioner still

had on deposit *in her own name* at Riggs/PNC to mislead Riggs/PNC. Debtor thus
intentionally violated both Section XI above and the court order containing it: He
contracted for a future debt in petitioner's name without her knowledge and he secured
credit based on petitioner's name and in reliance on her assets, all without petitioner's
knowledge. Debtor's intentional actions in obtaining money through this account in
petitioner's name, four years after the Court's entry of an order of divorce and settlement
prohibiting such action, constitutes fraud, false pretenses and false representation.

10.     Moreover, debtor also owes petitioner a fiduciary duty as a spouse/signor of an
agreement of divorce and settlement. That agreement of divorce and settlement is both a
contract and an equitable instrument in the state of Maryland. The court retains both
equitable and legal jurisdiction over it ; it can be enforced as both a contract, as well as
through the court's contempt powers. That fiduciary duty requires that the debtor deal
with petitioner in good faith because a divorce settlement agreement is entered into by the
parties under extreme emotional pressure and each party must be able to rely on the
promises and undertakings of the other. Debtor has intentionally breached that fiduciary
duty here.

11.     Under 11 U.S.C. section 523(a)(2), a debt of money or extension of credit is not
dischargeable when acquired by false pretenses, false representation or actual fraud;
under 523 (a)(4) it is not dischargeable when acquired by fraud or defalcation while
acting in a fiduciary capacity, embezzlement, or larceny; and under 523(a)(6) it is not
dischargeable due to willful and malicious injury by the debtor to petitioner and
petitioner's property. For all these reasons, Petitioner objects to discharge of this debt.

529 Plan Funds

12.     During the course of their marriage, petitioner and debtor instituted a 529 college

savings plan in Maryland for their son, Colin. By December 31, 2005, the plan contained

$14,636.00, or 2 years of tuition. This is the last date for which petitioner or Colin has

definite information on the content of Colin's 529 Plan Fund account. (See Ex 4).

However, upon information and belief, debtor continued to fund it at $6000.00/year for

several years after the parties' divorce and the value of the funds available in it by 2010

would have been far greater, likely approaching $40,000.00.

13.     The parties' divorce settlement agreement, discussed above, also contained

provisions regarding this 529 plan. Specifically in Section X, the agreement and

corresponding circuit court order stated that: "[Debtor] shall continue to contribute

$500.00 per month to the Maryland Prepaid College Trust Fund for the benefit of Colin

until such Plan is fully funded...". Additionally, and most importantly, Section X and the

circuit court's order required that: **"[Debtor] shall not remove any funds from the Plan**

**other than for the benefit of Colin for his college education, and all contributions**

**made thereto shall be utilized solely for Colin's college education."** (Ex 2)

14.     In knowing and intentional violation of the agreement and the circuit court's

order, debtor has emptied out the 529 Plan College Trust Fund account. Those funds

were being held in trust for Colin and they were solely for Colin's college education.

Without those funds Colin has no way to go to college. Debtor has breached his fiduciary

duty with regard to the 529 trust fund account.

15.     Pursuant to Section 523 (a)(2), debts for money obtained by false pretenses, false

representation or actual fraud are not dischargeable. Additionally, under 523 (a)(4) debts

acquired by fraud or defalcation while acting in a fiduciary capacity, embezzlement or

larceny are not dischargeable; and under 523(a)(6) debts acquired by willful and

malicious injury by debtor to another entity or the property of another entity are not

dischargeable. For all these reasons, petitioner objects to discharge of this debt.

## FRAUDULENT TRANSFERS

16.    Pursuant to the Bankruptcy Code, the Trustee is authorized to investigate and

move to avoid a transfer made by the debtor that is voidable under the Code, (11 U.S.C.

section 548), or under state law. (11 U.S.C. section 544(b)). Virginia Code sections 55-80

and 55-81 states that a transfer is voidable by creditors if it is made with the intent to

delay, hinder, or defraud creditors, or if made without valuable consideration. The statute

of limitations applicable to section 548 is two years; but the time limit under section 55-

81 of the Virginia Code is five years. And the time limit under section 55-80 is laches.

(section 8.01-253 of the Code of Virginia). Based on the fraudulent transfers below,

petitioner respectfully requests that the Court require the trustee to investigate the

fraudulent transfers and institute an adversary action to void the transfers.

### Retirement Funds

17.    From 1993 through August of 2006, debtor was a partner in the law firm of

Hogan and Hartson, located in the Tysons Corner, Virginia office. In late 2005, debtor

requested that the firm negotiate a termination agreement with him. On August 17, 2006,

debtor signed a withdrawal agreement with the firm in which, inter alia, he waived his

rights to a retirement payout likely equivalent to several million dollars. Specifically,

Section 7 of the withdrawal agreement provides that:

8

> [Debtor] fully and forever releases and discharges the Firm...from all claims of
> any nature whatsoever...[Debtor] understands that the release in this paragraph,
> specifically includes, without being limited to, any claims under federal, state,
> local or other law, and any claims relating to...compensation, benefits, or any
> other matters (including without limitation, claims or entitlement, if any, to any
> **potential future contingent payments under the Partners Unfunded**
> **Retirement Plan pursuant to Paragraph 9.3.4 and Schedule B of the**
> **Partnership Agreement** or otherwise). (See Ex. 5)

18.     These retirement benefits are not properly described in the withdrawal agreement.

They are not unfunded. They are funded by Hogan setting aside a percentage of its annual

income.  There are other former partners receiving these retirement funds in situations

like debtor's. Debtor had already qualified for these retirement benefits as a result of the

years he had been a partner. He needed only to wait a year or two until the firm's

payment of the retirement funds to him came due. This is a type of contingent contract

which imposes no burden on the debtor's estate. The debtor's estate is set to receive all

the benefits without incurring any costs.

19.     Moreover, debtor received either no compensation or inadequate compensation

for his waiver of what is likely to be several million dollars in retirement benefits.  A

Hogan partner from the Tysons Corner office was designated by the firm to explain the

withdrawal agreement. When he was asked to explain the relationship between the

waiver of the retirement benefits and the other terms of the withdrawal agreement, he

said there was no relationship.  The waiver of the retirement benefits was not reflected in

the payout amount in the withdrawal agreement; instead the payout was just a number

that both sides came to agree on.

20.     There are other indicia that the withdrawal agreement between debtor and Hogan

was not a true and complete description of their agreement. Despite its signing in August,

2006, and the agreement's statement that it was a complete termination of debtor's

relationship to the firm, debtor continued to supervise and direct substantial work from his "clients" back to partners at Hogan even after August, 2006. Those Hogan partners continued to handle the work as they had prior to the signing of the agreement, although debtor at this point was not receiving any "credit" for their work. He was actually giving income to Hogan which he would have earned had he done the work himself. Debtor also maintains offices in the same building where Hogan is located in Tyson's Corner. Debtor also continues to use the contract with Verizon that he was given by Hogan.

21.    Because this transfer of significant sums back to Hogan by debtor occurred within the relevant time frame under applicable Virginia statutes; and because it was done without adequate consideration, petitioner respectfully requests that the Court direct the trustee to investigate the fraudulent transfer and institute an adversary action to void the transfer. The sums at issue here are sufficiently great that they may adequately reimburse the unsecured creditors. Moreover, there is no burden on the debtor's estate to participate in this executory contract.

22.    Despite his "withdrawal" agreement from Hogan, debtor spent more than $750,000.00 in 2006, as evidenced by his own exhibit in Case No. 31574FL in Montgomery County, Maryland. (See Ex 6) Then in December 2006, debtor's living expenses were lowered because he began living with friends at the two addresses listed in his response to question 15 on the Statement of Financial Affairs. There is no information on debtor's income/expenditures in 2007; but based on debtor's information in his schedules here, debtor had "income" in 2008 of over $300,000.00 ($71749.00 plus $76000.00 plus $165,000.00) Yet it is during 2008 that debtor incurred most of the debts he is attempting to discharge here. There appears to be a lack of correlation between

10

debtor's income and expenditures and the debts he acquired in the same "look back" time
period.

### Robert Walls

23.     Debtor has an insider relationship with Robert Walls who is listed on debtor's
schedules. Debtor attends a "school" owned and run by Walls, called "Inner Search".
Debtor also pays Walls fees for individual "counseling" sessions and debtor lives down
the street from Walls and his wife, Mari, in Mclean, Virginia. The payments which debtor
has made to Walls for such "schooling" and "counseling sessions" are fraudulent
transfers. Walls has no credentials as a teacher or a counselor. Those payments are in the
tens of thousands of dollars for the relevant period. (See Question 3 on Statement of
Financial Affairs for debtor's claimed payments to Walls solely for 2009)

24.     Debtor also made contractual arrangements with Walls to build a two million
dollar house for him in Mclean, Virginia, although Walls had no experience or expertise
in building or construction. That house is now in foreclosure and is part of this Chapter 7
filing. Walls and his wife and son set up a new corporation, Walls Group LLC,
incorporated in the state of Maryland, solely for the purpose of contracting with debtor,
taking receipt of the construction loan payouts, and paying themselves to the detriment of
debtor's other building creditors. Walls Group LLC is now out of business as a result of
forfeiture in Maryland. It is not clear it ever had a license to do business in Virginia.

25.     Petitioner respectfully requests that the Court direct the trustee to investigate the
fraudulent transfer and institute an adversary action to void the transfer. (11 USC section
544, 548)

11

Payments to "clients"

26.    Debtor has made a practice of making payments to companies to cover their

business expenses, even when they are not paying him any compensation. Debtor has

admitted to paying $23,000.00 to one or more such companies in 2006. (See Hearing

Transcript of January 11, 2007 in Case No. 31574FL at pages 80-85.) Upon information

and belief debtor has continued that practice to the present. This transfer of debtor funds

without consideration occurred in the relevant time frame and petitioner respectfully

requests this Court to direct the trustee to examine debtor's actions and move to void any

fraudulent transfers. (11 USC section 544, 548)

## OBJECTION TO DISCHARGE OF DEBTOR

### Pattern of Fraud and Concealment

27.    Petitioner hereby restates and incorporates by reference all the contents of

paragraphs 4 through 26, above. As shown there, debtor has orchestrated and participated

in a continuing pattern of fraud, concealment, and misrepresentation in an effort to

prevent creditors from receiving payment or reimbursement. When this pattern of

fraudulent actions is combined with the numerous errors and omissions on debtor's

Chapter 7 forms in this proceeding, debtor is not entitled to the discharge otherwise

available under Chapter 7.

### Omissions and Errors

#### Schedule J

28.    On Schedule J, debtor is required to list current expenditures. That schedule lists

no expenses for a mortgage or home insurance or home repairs etc because debtor is not

12

currently paying them. However, debtor does list spousal and child support at a total of
$6000.00 a month, This is a misrepresentation because debtor is not currently paying this
amount either. He has not paid spousal or child support since the fall of 2008. Debtor has
likely listed the monthly spousal and child support, even though he is not paying it,
because without it his monthly expenses are only $ 2,180.00/month. His average
monthly income is $2000.00. His "deficit" then is only $180.00/month.

29.     On further examination, $800.00 a month for food for only *one* person--the
debtor--is unnecessarily high.  For example, Petitioner budgets $800.00/month to feed
*three* people--herself and two sons. Also, debtor lists $385.00/month for health insurance;
but upon information and belief, the health insurance which debtor is required to provide
by court order for their minor son is not being provided; also the minor son's doctors and
providers are listed on debtors' list of creditors.  Finally, the minor son's doctors and
providers are now trying to collect from petitioner for bills they have not been able to
collect from debtor. Thus, as a result of misrepresenting his "current" payment of spousal
and child support and health insurance, there is likely an additional $500.00 plus a month
which is available and unencumbered in debtor's budget.

## Statement of Financial Affairs

*Question 1*--requires a statement of income for 2010, 2009 and 2008, and requires
the identification of the beginning and end dates of the debtor's fiscal years. However,
debtor does *not* provide information for 2009, nor does he identify the "year" he is using.

*Question 2*--Here debtor lists IRA distributions, but he does *not* list the
distribution he took from the Maryland 529 Plan Trust Fund.  This omission added to his

13

failure to list in *Question 4* the lawsuit to recover the 529 Plan monies pending in Montgomery County Circuit Court--Case No. 320986-V--makes it clear that *debtor is concealing from this court, the trustee and his creditors the existence of that suit for fraud.* Debtor also fails to list in *Question 4* a second case in Montgomery County Circuit Court regarding current and past due amounts of spousal and child support and other violations of Court orders. (Case No 31574FL)

*Question 10*--Here debtor lists a transfer of 50% of his interest in xFDA LLC to Robert Alan Walls-- the same Walls discussed in paragraphs 23-25, above--but no date is given for the transfer. And xFDA's payment of income to debtor in 2009 is omitted in *Question 2.*

*Question 18*—This question calls for all businesses in which debtor was, inter alia, a partner, an officer, etc in the six years prior to filing. Debtor has lists 4 businesses but only covers the years 2008 to the present. Also he lists two of the four without giving beginning or end dates. Upon information and belief, there are a greater number than four companies in the last six years that should be listed there. Stemron, RealTimeHealth and Hogan and Hartson should be listed there. And there are likely others that should be listed there also.

WHEREFORE Petitioner prays for the following:

1. That all arrearages of child and spousal support listed on Schedule E be held nondischargeable;

2. That the PNC debt which debtor intentionally incurred in petitioner's name without petitioner's knowledge or consent, years after the parties' divorce, and in violation of court order be held nondischargeable;

3. That the debt for the 529 funds which debtor took from the College Trust Fund Account of the minor son be held nondischargeable;

4. That the Trustee be directed to examine the debtor's actions in regard to his transfer of retirement benefits; his transfer of funds through payments of various companies' business expenses without adequate consideration; and his transfers of funds to Robert Walls, and Walls family members, and Walls' companies, and that the Trustee be directed to initiate proceedings to avoid the transfers; and

5. That the Trustee be directed to examine debtor's actions for a pattern of fraud and concealment and that debtor be denied discharge.

Respectfully Submitted,

Mary Lyons

Mary Lyons
9024 Honeybee Lane
Bethesda, Maryland 20817
301-365-4915

Pro Se

Date: May **23**, 2010

Exhibit 1

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARY LYONS
     Plaintiff

    vs.                  Case No. 305334-V

KENNETH HAUTMAN
     Defendant

## NOTICE OF JUDGMENT
(817)

**I HEREBY CERTIFY** that the following Judgment was entered in the above

entitled case on April 27th, 2009:

SUMMARY JUDGMENT ENTERED AND RECORDED IN THE JUDGMENT INDEX IN FAVOR
OF THE PLAINTIFF, MARY LYONS AND AGAINST THE DEFENDANT, JOHN KENNETH
HAUTMAN A/K/A KENNETH HAUTMAN, IN THE PRINCIPAL AMOUNT OF TWENTY-TWO
THOUSAND AND FIVE HUNDRED DOLLARS ($22,500.00) FOR THE CLAIMS FOR THE
PERIOD SEPT THRU DEC, 2008.

    **IN TESTIMONY WHEREOF,** I hereunto set my hand and affix the seal of

this Court.

_Loretta E. Knight_
Clerk of the Circuit Court for
Montgomery County, Maryland

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

MARY LYONS
9024 Honeybee Ln, Bethesda Md 20817
Plaintiff

v.                                                    Case No._____

KENNETH HAUTMAN
8005 Lancia Court, Mclean, Virginia 22102
Defendant

COMPLAINT

COMES NOW the Plaintiff, Mary Lyons, and respectfully files this Complaint
and states as follows:

1.  The Plaintiff is a resident of Montgomery County, Maryland.

2.  The Defendant is a resident of Fairfax County Virginia who is subject to the
    jurisdiction of the Circuit Court of Montgomery County, Maryland which
    retained jurisdiction over the parties Voluntary Separation and Property
    Settlement Agreement, signed July 11, 2004 and entered as an order of the
    court on July 23, 2004.

3.  The Plaintiff and the Defendant entered into a Voluntary Separation and
    Property Settlement Agreement [hereinafter "PSA"] to settle a divorce action.
    That Property Settlement Agreement was signed by the parties and
    incorporated but not merged into an Order for Absolute Divorce on July 23,
    2004 by the Circuit Court for Montgomery County. (See Exhibit 1)

4.  Because the Property Settlement Agreement was incorporated but not merged
    into the Judgment of Divorce, it is enforceable as a contract between the
    parties.

5.  Pursuant to that contract, as modified, the Defendant is required to pay the
    Plaintiff $4500.00 a month in spousal support, and $1500.00 a month in child
    support. (See Exhibit 2)

1

6.  Defendant is now four months in arrears on spousal support payments, and three months in arrears on child support payments. Specifically, the Defendant failed to pay spousal support in September, October, November, and December, 2008, and to date owes Plaintiff $18,000.00 in spousal support payments.

7.  Defendant is now three months in arrears on child support payments. Specifically, the Defendant failed to pay child support in October, November and December, 2008, and to date owes Plaintiff $4500.00 in child support payments.

8.  Pursuant to the Property Settlement Agreement as modified, the Defendant presently owes Plaintiff a total of $ 22,500.00 in support payments and is in breach of that contract.

9.  Pursuant to the Property Settlement Agreement, Plaintiff is required to give Defendant notice prior to initiating legal action for breach of any of the provisions of the settlement provisions. Plaintiff has given Defendant such notice.

10. The Court of Special Appeals of Maryland recently issued an opinion upholding the monthly amounts of spousal and child support due under the parties' Property Settlement Agreement.

WHEREFORE Plaintiff respectfully requests the following relief:

A.  That this Court find that Defendant has breached the settlement agreement he has with Plaintiff;

B.  That this Court find that Defendant owes Plaintiff $22,500.00 in unpaid spousal and child support;

C.  That judgment be entered in Plaintiff's favor and against Defendant for $22,500.00 plus fees, court costs and interest;

D.  And for such other and further relief that this Court deems necessary and proper.

2

I DO SOLEMNLY AFFIRM AND DECLARE UNDER THE PENALTIES OF
PERJURY THAT THE CONTENTS OF THE FOREGOING COMPLAINT ARE TRUE
AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND
BELIEF.

MARY LYONS

Respectfully submitted,

By: _____

Mary Lyons
9024 Honeybee Lane
Bethesda, Maryland 20817
301-365-4915

Mary Lyons
9024 Honeybee Ln
Bethesda Md 20817

Kenneth Hautman
8605 Lanaa Court
McLean, Virginia 22102

3

# EXHIBIT 2

Form 281 (08/06)

# United States Bankruptcy Court

<u>EASTERN</u>   District Of   <u>VIRGINIA</u>

In re John Kenneth Hautman   Case No. _____
<u>Debtor(s)</u>

## APPEARANCE OF CHILD SUPPORT CREDITOR*
## OR REPRESENTATIVE

I certify under penalty of perjury that I am a child support creditor* of the above-named
debtor, or the authorized representative of such child support creditor, with respect to the
child support obligation which is set out below.

Name: Mary Lyons
Organization:
Address: 9024 Honeybee Lane
Bethesda Oma 20817
Telephone Number:

<u>301-365-4915</u>   X <u>Mary C Lyons</u>
Date   Child Support Creditor* or Authorized Representative

---

**<u>Summary of Child Support Obligation</u>**

Amount in arrears:

$ 4500.00 + 25,500 = 30,000.00

Amount currently due per week or per month:
on a continuing basis:

$ 375.00 / wk
(per week) (per month)

If Child Support has been assigned:

Amount of Support which is owed
under assignments:

$ _____

Amount owed primary child support
creditor (balance not assigned):

$ _____

**Attach an itemized statement of account. Do not disclose the name of a minor child. See 11 U.S.C.
§ 112. If a social security number or a taxpayer identification number is included, set out only the
last four digits of the number. Judicial Conference Privacy Policy (09/01).**

---

* Child support creditor includes both creditor to whom the debtor has a primary obligation to pay child support
as well as any entity to whom such support has been assigned, if pursuant to Section 402(a)(26) of the Social
Security Act or if such debt has been assigned to the Federal Government or to any State or political subdivision
of a State.

Child Support Statement of Account

Arrearages

October, November and December 2008-------4500.00

January through December 2009----------------18000.00

January through May 2010------------------------7500.00

Total                                    $30000.00

EXHIBIT 3

## VOLUNTARY SEPARATION AND PROPERTY SETTLEMENT AGREEMENT

THIS AGREEMENT made this _11_ day of July, 2004, by and between KENNETH J.

HAUTMAN (hereinafter referred to as "Husband"), and MARY C. LYONS (hereinafter

referred to as "Wife").

### WITNESSETH:

WHEREAS, the parties were lawfully married to each other on February 16, 1985 in

Silver Spring, Maryland; and

WHEREAS, two children were born to the parties of their marriage, namely,

Christopher J. Hautman, born August 13, 1987, and Colin M. Hautman, born December 21,

1992; and

WHEREAS, the parties separated on or about September 14, 2002; and

WHEREAS, the parties have full knowledge of the extent, value and character of the

property owned by them separately or jointly, and of their respective means, obligations

and needs; and

WHEREAS, the parties have agreed to settle and determine their obligations to

each other; those relating to the custody and support of their minor children; support

obligations by and between the parties for one another; property rights; and all other rights,

claims, relationships or obligations between them arising out of the marriage relationship or

otherwise.

NOW, THEREFORE, in consideration of the mutual promises contained in this

Agreement and of the acts to be performed by the respective parties to this Agreement, it

is agreed as follows:

Husband shall not change or alter the amount of death benefits or designated beneficiaries on the respective policies and trusts. From time to time, upon requests, Husband shall provide Wife with information confirming that any and all said life insurance policies are in full force and effect under unchanged terms for the duration of alimony in conformance with his obligations hereunder.

8.1   Should Wife elect at her own expense to obtain life insurance on Husband's life, Husband shall cooperate fully in Wife's efforts to secure the same, including, but not limited to, completing all requisite forms and undertaking any and all necessary medical examinations. In no event shall Husband be responsible for any costs or expenses for such life insurance or for his cooperation with Wife's efforts to secure the same.

## IV. DISABILITY INSURANCE

9.0   Husband shall maintain his current disability insurance policy until Colin graduates from high school. From time to time, upon reasonable request, Husband shall provide Wife with information confirming that said disability insurance is in full force and effect in conformance with his obligations hereunder.

## X.   COLLEGE EDUCATION

10.0  Husband shall continue to contribute Five Hundred Dollars ($500) per month to the Maryland Prepaid College Trust for the benefit of Colin until such Plan is fully funded in accordance with its terms. Husband shall not remove any funds from the Plan other than for the benefit of Colin for his college education, and all contributions made thereto shall be utilized solely for Colin's college education. In the event Husband fails to fully fund

18

the Plan, he shall be responsible to contribute towards Colin's college education expenses an amount equal to the difference between balance of the Plan account if fully funded and the balance in the Plan account at the time Colin graduates from high school.

## XI. DEBTS

11.0    Except as otherwise provided herein, Husband shall be solely responsible for, and shall pay in accordance with the terms and conditions thereof, the joint Riggs Bank credit line and shall indemnify and hold harmless Wife therefrom, including attorneys fees. Except as otherwise referenced by this Agreement, the parties own no joint debts. Wife shall solely be responsible for all payments and liability arising out of the Lexus lease and any and all debts arising out of the Honeybee Lane property (except those reimbursements Wife shall be entitled to purusant to the Consent *Pendente Lite* Order) and shall indemnify and hold Husband harmless from any such liability, including attorney fees.    Unless expressly provided otherwise by this Agreement, the parties covenant and agree that each shall be responsible for his or her own debts and the parties hereto agree that no future debts will be contracted in the name of the other party and to hold the other harmless in the event of a breach of this provision.  The parties further agree that neither party shall charge or cause to permit to be charged to or against the other any purchase or purchases which either of them may hereafter make and shall neither hereafter secure or attempt to secure any credit upon or in connection with the other, or in his or her name.

## XII. INCOME TAXES

19

# EXHIBIT 4

# MARYLAND PREPAID COLLEGE TRUST

## OFFERS THE SECURITY OF A LEGISLATIVE GUARANTEE

February 16, 2006

Mr. Kenneth J. Hautman
8605 Lancia Court
Mc Lean, VA 22102-2202

１ｌｌｄｕｌｄｌｕｌＩＩＩｕｕｌｄｌｄｌｕｌｄＩＩｕｕｌｄＩＩｕｕｌｄｌｕｌｄＩＩ

This annual statement of account reflects your financial information as of December 31, 2005.

| | |
|---|---|
| **Account Holder:** | **Mr. Kenneth J. Hautman** |
| **Beneficiary:** | **Colin M Hautman** |
| **Account Number:** | **03002814** |
| **Tuition Plan:** | **University Plan - 4 Years** |
| **Projected Enrollment Year:** | **2011** |

### Contract Payment Status

| | |
|---|---|
| Contract payments received in 2005 | $6,048.00 |
| Contract payments received to date | $14,636.00 |
| Fees paid | $75.00 |
| Late fees due | $0.00 |
| Returned check fees due | $0.00 |
| Other administrative fees due | $0.00 |

### Tuition Years as of 12/31/05

| | |
|---|---|
| Years Paid | 2.010 |
| Years Used | .000 |

This section shows how many years (or parts of years) you have paid for as of December 31, 2005.
Please note that 2 years of the Community College Plan equals 1 year.

This is not a tax form, but a statement of financial information. It is not to be attached to your tax forms but kept for your records. If you have any questions regarding State tax advantages of the Maryland Prepaid College Trust, you may call the Office of the Comptroller at 1 800 MD TAXES.

If you have any questions concerning this account, please contact us toll free at 1-888-4MD-GRAD and select option #2, then select option #1. We will be pleased to assist you in any way possible.

*The College Savings Plans of Maryland Board*

---

217 E. Redwood Street | Suite 1350 | Baltimore, Maryland 21202 | Telephone: (410) 767-2949

Toll Free: 1-888-4MD-GRAD | TTY Maryland Relay: 1-800-735-2258 | Fax: (410) 333-2295 |

www.collegesavingsmd.org | E-mail: accounts@collegesavingsmd.org

# EXHIBIT 5

Δ's

16

CONFIDENTIAL

### Agreement

This Agreement, effective as of the date specified in paragraph 7.b. below, sets forth the terms mutually agreed upon between Kenneth John Hautman ("Partner") and Hogan & Hartson L.L.P. ("H&H" or the "Firm") regarding Partner's departure from the Firm.

1.  (a) <u>Departure Date.</u> Partner and H&H hereby mutually agree to terminate the relationship of Partner to H&H; Partner hereby irrevocably notifies H&H of his departure from the Firm pursuant to Paragraph 9.1.1(C) of the Amended and Restated Partnership Agreement, as amended through the current date (the "Partnership Agreement"), effective on the first calendar day following the expiration of the revocation period described in paragraph 7.b. below, assuming no revocation has occurred ("Departure Date"). Effective on the Departure Date, Partner's partnership status in the Firm will terminate, and Partner will have no continuing relationship or status with the Firm, except as provided in paragraph 1 (b) below. The Firm will treat Partner consistent with the Firm's past practices with respect to other inactive retiring or departing partners. The Firm will issue an announcement or memo, consistent with the Firm's past practice, announcing that Partner is leaving the firm to pursue other business interests and has agreed to remain as "Of Counsel" to assist with the transition.

(b)  Of Counsel Status. Following the Departure Date, Partner will have inactive Of Counsel status until the earlier of December 31, 2006, or such date as Partner commences working for another law firm or other entity or as a sole practitioner; provided, however, (i) Partner shall not engage in the practice of law or otherwise engage in professional activities on behalf of the Firm while Of Counsel, and (ii) the Firm, in its sole discretion, may terminate Partner's Of Counsel status at any time. During Of Counsel status, the firm will provide voice mail capability and capability to send and receive e-mails on its systems, but will not provide office space and administrative or other services.

2.  Transition. Before the Departure Date, Partner will cooperate with Richard Horan or his designee concerning transfer of client and administrative files, return of all firm property, and other standard departure matters.

3.  <u>Prior Earnings.</u> Partner continued to receive all earnings due, consistent with the shares Partner holds according to the current Schedule A to the Partnership Agreement, through May 31, 2006. No further earnings, distributions, compensation, bonuses, severance pay or payments of any kind will be made to Partner by the Firm except as expressly provided in Paragraph 4 below.

4.  <u>Payments.</u> The Firm will pay Partner a total amount of $615,000, payable as follows: (a) within two (2) business days after the Departure Date, the Firm will pay Partner a lump sum payment equal to $307,500 (reduced by those items listed on <u>Schedule A</u>, attached hereto and incorporated herein), and (b) on or about January 6, 2007, the Firm will pay Partner a lump sum payment equal to $307,500 (reduced by the Partner's personal account balance, if any,

as of January 6, 2007; any expense account advances owed by Partner to the Firm, if any, as of January 6, 2007; estimated 2006 non-resident taxes, if any; estimated 2007 non-resident taxes, if any; and required contributions to the Partners' Retirement Plan and the Cash Balance Plan and an elective contribution(s) to the 401(k) plan, if any). Tax and interest reconciliations will occur in April after the years in which such lump sum payments are paid, with Partner being issued a check for any amounts due him, or if Partner owes tax or interest, Partner will issue a check to the Firm for amounts he owes. All amounts paid under this Paragraph shall be reported on a K-1.

      5.     <u>Capital Return.</u>  Partner's full capital account will be used to repay his capital loans with Barclays Bank, in accordance with the terms of the Partnership Agreement; accordingly, no capital is due to be returned to Partner.

      6.     <u>Benefits.</u>  Until the Departure Date, Partner will continue to participate in the firm's Partners' Retirement Plan, Cash Balance Plan, the 401(k) Plan, and the Firm's medical, dental, disability and life insurance plans and malpractice insurance policies as may be in effect from time to time, subject to their generally applicable terms and conditions, including Partner's payment of required contributions and premiums. Upon the Departure Date, benefits provided by the Firm terminate in accordance with the standard terms applicable to departing partners. It is understood that after the Departure Date, Partner remains entitled, consistent with terms of the applicable plans and policies, to: any benefits that are then vested in the Partners' Retirement Plan (subject to outstanding loans from the plan), the Cash Balance Plan and the 401(k) Plan, continuation of medical and dental coverage under COBRA at Partner's own expense if timely elected by Partner for the period of time provided by COBRA; conversion of Partner's group long-term disability benefits to an individual policy at Partner's own expense upon timely application by Partner; conversion of Partner's group life insurance benefits to an individual policy at Partner's own expense upon timely application by Partner; and continuation at Partner's own expense of the supplemental income protection plan Partner purchased in accordance with the terms of such insurance.

      7.     <u>Release of Claims; Related Matters.</u>

      (a)     Except for the Firm's obligations under this Agreement, Partner fully and forever releases and discharges the Firm (including its affiliated offices and the entities related thereto), and its current, past and future partners, agents, employees, attorneys, representatives, insurers and benefits plans, from all claims of any nature whatsoever, whether known or unknown, which Partner now has or may have against any one or more of them arising out of or in connection with his relationship with the Firm, his departure from the Firm, or any other matter existing on or before the date Partner signs this Agreement. Partner understands that the release in this paragraph specifically includes, without being limited to, any claims under federal, state, local or other law, and any claims relating to breach of contract, tort, discrimination on any basis (including, without limitation, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, all as amended, and any similar laws of Virginia, the County of Fairfax, the District of Columbia, or any other state or local entity), compensation, benefits, or any other matters (including, without limitation, claims or entitlement, if any, to any future potential contingent payments

2



under the Partners' Unfunded Retirement Plan pursuant to Paragraph 9.3.4 and Schedule B of the Partnership Agreement or otherwise). The foregoing release will not affect Partner's coverage under the Firm's malpractice insurance coverage for his activities while he was engaged by the Firm. Partner is solely responsible for his personal taxes and any other obligations relating to the payments contemplated hereunder, and hereby agrees to hold harmless and indemnify the Firm and other releasees hereunder with respect to any damages, costs or expenses they may incur as a result of such taxes or other asserted obligations (including, without limitation, any claims by any third party with respect to the payments made hereunder, provided, however, that as a condition precedent to such hold harmless and indemnification with respect to asserted obligations (other than taxes), the Firm agrees to provide Partner with written notification of any claim against the Firm and, if time otherwise permits, reasonably cooperate with Partner in any effort he undertakes to resolve and/or seek the withdrawal of such claim prior to the Firm incurring a significant cost or expense defending or otherwise dealing with such claim). The Firm (including the affiliated offices described above), fully and forever releases and discharges Partner, and his successors, heirs, beneficiaries and assigns, agents, employees, attorneys, representatives, and insurers from all claims of any nature whatsoever, whether known or unknown, which the Firm now has or may have against any one or more of them arising out of or in connection with Partner's relationship with the Firm, his departure from the Firm, or any other matter existing on or before the date Partner signs this Agreement.

(b)   Partner acknowledges that he is being given twenty-one days to consider this Agreement, including the release in paragraph 7.a.; that he may voluntarily execute and deliver the Agreement before the end of such twenty-one day period; that he has been advised to consult with, and has consulted with, his attorney, before executing this Agreement; that he will have seven days after executing this Agreement to revoke it (by written notice delivered to Richard Horan within the seven-day period); and that this Agreement, including the Firm's promises herein, will become effective and enforceable on the first calendar day after this seven-day revocation period has expired, provided it has not previously been revoked.

(c)   Except for any confidential consultation with Partner's counsel, tax or financial advisors, and spouse, ex-spouse and her representatives, Partner will not, without written permission of a member of the firm's Executive Committee, disclose the existence or terms of this letter agreement, including the release of claims, to any person or entity unless required to do so by law, court rule, or pursuant to any lawful court order or subpoena. In addition, Partner will not state orally or in writing to any person or entity that the Firm or any of its current or former partners, officers, agents or employees engaged in any improper or unlawful conduct concerning Partner.

8.   Laptop Computer. Partner agrees that he shall return the laptop computer issued to him by the Firm so that the Firm may remove and/or purge from the laptop computer all Firm and/or client software, files, data and information. After such removal/purge process, the Firm will give the laptop computer to the Partner and he may retain it for personal use.

3

9.    <u>Entire Agreement.</u>

This Agreement contains our entire agreement relating to the subjects herein.

Hogan & Hartson L.L.P.

_____
Kenneth John Haufman

By: _____
     Richard T. Horan, Jr.
     Executive Committee Member

Date: _____8-17-06_____

Date: _____8-17-06_____

4

## Schedule A

1. Personal account balances as of the Departure Date which the Firm estimated as of July 31, 2006 to be as follows:

| | |
|---|---|
| Medical Insurance | 3,015.42 |
| Dental Insurance | 285.33 |
| LTD Insurance | 157.08 |
| Life Insurance | 307.74 |
| SIPP Insurance | 673.86 |
| Investment Fund Distribution | (2,410.84) |
| Postage | 5.13 |
| Air Freight | 20.67 |
| Telephone –Verizon Wireless | 1,233.05 |
| | $3,287.44 |

2. Remaining 2006 Retirement Plan Contributions - $2,421.63

3. Remaining 2006 Cash Balance Plan Contributions - $23.37

4. Remaining 2005 Non-Resident Taxes - $12,822.91.

5. 2006 Non-Resident Taxes which the Firm estimates to be $3,000.00.

6. Any expense account advances owed by Partner to the Firm as of the Departure Date.

7. Estimated interest to be due on the Partner's Capital Loan which the Firm estimates as of July 31, 2006 to be as follows:

| | |
|---|---|
| June 16, 2006 to January 15, 2007 | $2,929.29 |
| January 16, 2007 to January 15, 2008 | $1,937.42 |

EXHIBIT 6



## SUMMARY OF 2006 CHECKING ACCOUNT ACTIVITY

| DATE | BEG BAL | DEPOSITS | CHECKS | END BAL |
|------|---------|----------|--------|---------|
| 1/5/06 | $21,585.94 | $16,717.11 | $38,301.70 | $1.35 |
| 2/3/06 | $1.35 | $200,704.32 | $107,152.64 | $93,553.03 |
| 3/3/06 | $93,553.03 | $18,382.04 | $67,794.29 | $44,140.78 |
| 4/5/06 | $44,140.78 | $29,747.11 | $38,296.72 | $35,591.17 |
| 5/3/06 | $35,591.17 | $3,603.07 | $39,206.56 | -$12.32 |
| 6/5/06 | -$12.32 | $72,823.20 | $48,687.40 | $24,123.48 |
| 7/6/06 | $24,123.48 | $18,088.97 | $38,724.57 | $3,487.88 |
| 8/3/06 | $3,487.88 | $50,004.91 | $30,752.78 | $22,740.01 |
| 9/6/06 | $22,740.01 | $282,471.64 | $227,748.59 | $77,463.06 |
| 10/4/06 | $77,463.06 | $1,058.24 | $33,223.44 | $45,297.86 |
| 11/3/06 | $45,297.86 | $17.11 | $26,334.29 | $18,980.68 |
| 12/5/06 | $18,980.68 | $35,485.65 | $27,248.78 | $27,217.55 |
| 1/4/07 | $27,217.55 | $3,834.15 | $22,176.32 | $8,875.38 |



DEFENDANT'S
EXHIBIT
44